IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: TWO (2) APPLE IPHONE DEVICES, AND ONE C5L MAX ANDROID DEVICE, AS FURTHER DESCRIBED IN ATTACHMENT A, CURRENTLY LOCATED AT ALEXANDRIA POLICE DEPARTMENT, 3600 WHEELER AVENUE, ALEXANDRIA, VIRGINIA | Case No. 1:24-SW-746 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Kenneth Louvar, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of three electronic devices that are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been since January 2014. As such, I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I am presently assigned to the Washington Division Office, Task Force Group 44 of DEA. Since joining DEA, I have participated in multiple investigations of individuals and organizations for violations of the federal narcotics laws. As part of these investigations, I have been involved in the application for and execution of arrest and search warrants for narcotics-related offenses resulting in the prosecution

and conviction of individuals and the seizure of illegal drugs, weapons, illegal drug proceeds, and other evidence of criminal activity. Through the DEA Training Academy, I have attended and completed numerous training courses and seminars related to undercover narcotics investigations, drug interdiction, conducting interviews, drug recognition, fraud, and money laundering.

3. Based on this training and experience, I have become knowledgeable of the methods and modes of narcotics operations, including the use of cellular telephones by drug traffickers. I have gained knowledge in the use of various investigative techniques, including the utilization of wiretaps, physical surveillance, undercover agents, confidential informants, cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

5. The property to be searched are the following items, which are described in Attachment A and collectively referred to herein as the "**TARGET DEVICES**":

(a) a purple C5L Max Android cellular device, bearing Alexandria Police Department Evidence Number EVD-23-242713, hereinafter **TARGET DEVICE 1;**

(b) a blue Apple iPhone, with a black case containing the inscription "Money Maul,", bearing Alexandria Police Department Evidence Number EVD-23-242714, hereinafter **TARGET DEVICE 2**; and

(c) a blue Apple iPhone, with a black Otterbox case, bearing Alexandria Police Department Evidence Number EVD-23-242715, hereinafter **TARGET DEVICE 3.**

6. The **TARGET DEVICES** are currently located at the Alexandria Police Department (APD), 3600 Wheeler Avenue, Alexandria, Virginia, which is located in the Eastern District of Virginia.

7. The requested warrant would authorize the forensic examination of the **TARGET DEVICES** for the purpose of identifying the electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8. Based on the facts set forth in this affidavit, the fact that **Karon BLALOCK ("BLALOCK")** has been indicted on one count of violating 21 U.S.C. § 846 (Conspiracy to Distribute and Possess with Intent to Distribute Cocaine) in the United States District Court for the District of Columbia, case number 23-cr-73 (CKK), as well as my training and experience, I submit that there is probable cause to believe that evidence, instrumentalities, and/or fruits of violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 21 U.S.C. § 846 (Conspiracy Thereof) (collectively, the "**TARGET OFFENSES**") will be found in the **TARGET DEVICES**. There is also probable cause to search the **TARGET DEVICES** described in Attachment A, for the items described in Attachment B.

### *Initial Investigation*

9. I hereby incorporate by reference the background of the investigation articulated in the residential search warrants previously authorized by this Court in Case Nos. 1:23-SW-651, 1:23-SW-652, and 1:23-SW-653.

10. On January 18, 2022, a three-count indictment was returned against defendants Larry and Justice EASTMAN, charging them with conspiracy to distribute fentanyl; distribution of fentanyl resulting in serious bodily injury; and distribution of fentanyl resulting in the death of a victim, in case 22-cr-022-CKK. The charges relate to the November 2020 overdose resulting in serious bodily injury and April 2021 overdose death of a female victim due to fentanyl toxicity and subsequent investigation that Larry and Justice EASTMAN supplied the victim the fentanyl pills on both occasions. Both Larry and Justice EASTMAN have pled guilty to Count I of their indictment, charging conspiracy to distribute fentanyl, and have been sentenced. Larry EASTMAN was sentenced to 140 months in prison and 36 months supervised release. Justice EASTMAN was sentenced to 37 months in prison and 36 months supervised release.

11. Further investigation by the DEA, United States Postal Inspection Service ("USPIS"), the Bureau of Alcohol, Tobacco and Firearms ("ATF"), and the Metropolitan Police Department ("MPD") has resulted, to date, in the indictment of more than two dozen defendants, including **BLALOCK**, who are accused of conspiring to possess and distribute 400 grams or more of fentanyl, along with additional federal offenses, including conspiracy to commit international money laundering, in Case No. 23-cr-73-CKK.

12. As detailed below, law enforcement has identified the phone numbers utilized by many members of the conspiracy, including **BLALOCK**. Law enforcement determined that the members of the conspiracy utilize the phone numbers via phone call, video chat, and text message

to further the objectives of the conspiracy, including the purchase and redistribution of bulk quantities of fentanyl (and other narcotics), as well as accompanying details, such as negotiating price and quantities. Because conversations are extensive, excerpts of some relevant conversations are detailed below.

13. On February 24, 2023, a federal search warrant was executed by the DEA at Hector VALDEZ's residence in Santa Fe Springs, California. Located in the residence was approximately 5 kgs of blue "M-30" pills and powdered fentanyl. Samples of the blue "M-30" pills and powdered fentanyl were field tested by investigators and tested positive for fentanyl. The search warrant led investigators to seize VALDEZ's cell phones and review information contained therein. This search of VALDEZ's cell phones by investigators revealed hundreds of text messages regarding the sale and redistribution of blue "M-30" fentanyl pills. Investigators were able to identify the blue "M-30" fentanyl pills to be referred to as "Blues". Investigators were able to identify additional terms used to reference quantities of blue "M-30" fentanyl pills to include a "Jar" which is identified as one hundred blue "M-30" fentanyl pills and a "Boat" which is identified as one thousand blue "M-30" fentanyl pills.

14. Investigators were also able to identify two Instagram accounts for VALDEZ, "lilcurl.b" and "80017lilcurl.b". The District Court for the District of Columbia authorized search warrants (22-sc-2831 and 23-sc-1739) to be executed on these two Instagram accounts. Investigators know "80017lilcurl.b" to be the most recent account for VALDEZ. A review of both accounts revealed numerous images of VALDEZ, luxury vehicles, U.S. currency, and narcotics. Furthermore, there were hundreds of messages regarding the sale and redistribution of blue "M-30" fentanyl pills and multiple individuals sending their phone number to VALDEZ via direct

messages. Many additional Instagram accounts were identified with direct messages and providing phone numbers.

15. Throughout this case investigators identified numerous D.C. area recipients of blue "M-30" fentanyl pills sold by VALDEZ. Many of these recipients have trafficked blue "M-30" fentanyl pills within D.C., including **BLALOCK**, using their respective telephone numbers to communicate with VALDEZ to facilitate the downstream trafficking of blue "M-30" fentanyl pills to D.C.-based redistributors, including **BLALOCK**.

### *Identification of Karon BLALOCK*

16. A search of VALDEZ's cell phone revealed text messages regarding the sale and redistribution of blue "M-30" fentanyl pills with a contact saved as "Fatbags". The phone number for contact "Fatbags" is (202) 817-7596, which had text messages with VALDEZ beginning on August 2, 2022 through January 20, 2023. Based upon your affiant's review of the text messages and other investigative steps described *infra*, your affiant believes the contact "Fatbags" to be **BLALOCK**.

17. The conversation between VALDEZ and **BLALOCK** almost immediately related to suspected drug trafficking. For example, on September 16, 2022, VALDEZ texted **BLALOCK**, "You needed some candies?," to which **BLALOCK** responded "Yea u got some". VALDEZ replied: "Yesss sirrrr how many you need?" **BLALOCK** then responded: "I wann check it out first tho. Wya." Your affiant understands this to mean that VALDEZ solicited **BLALOCK** for the purchase of pills, to which **BLALOCK** agreed, but that before **BLALOCK** agreed to purchase the counterfeit fentanyl pills, he requested to inspect the pills first. Your affiant knows based on my training, experience, and knowledge of this conspiracy that counterfeit fentanyl pills are more attractive for resale on the street when they more closely resemble the authentic oxycodone pills

6

that they are pressed to resemble.

18. On September 23, 2022, VALDEZ texted **BLALOCK**, "I can give you a better ticket too." Your affiant understands "ticket" to mean "price." **BLALOCK** responded, "When I'm ready leave me alone [emoji]" "Ite bet [emoji]." VALDEZ replied, "75 cents and okay bet my bad [emoji]." Your affiant understands this to mean that VALDEZ was offering to sell **BLALOCK** blue "M-30" fentanyl pills for 75 cents per pill.

19. On December 10, 2022, VALDEZ sent a text message to **BLALOCK**: "When you need more pops." **BLALOCK** "Loved" the message. VALDEZ said, "I got you at 50 cents". "Fire ones". Your affiant believes this conversation to be VALDEZ telling **BLALOCK** to let VALDEZ know when he is ready to purchase more blue "M-30" fentanyl pills, that VALDEZ can sell the pills at fifty cents per pill, and that the pills are of high quality.

20. On December 2, 2022, VALDEZ texted **BLALOCK**, "Or wanna link in the am." The next day, **BLALOCK** texted "Yoo" "Karonblalock14@gmail.com". Your affiant believes this email to be "Fatbags's" email. Further, investigators found an incident reported by the Maryland Transportation Authority Police at Baltimore-Washington International Airport in which **BLALOCK's** number was listed as (202) 817-7596.

21. On January 18, 2023, VALDEZ sent a text message to (202) 817-7596, "I can do blues at 48 cents now". Your affiant believes this text message to be VALDEZ telling **BLALOCK** that VALDEZ can sell blue "M-30" fentanyl pills at a price of 48 cents per pill, two cents cheaper than the 50 cents referenced above.

22. Investigators also identified an Instagram account belonging to **BLALOCK**, which used the vanity name, "ceobaggz". The registered email address for this account is karonblalock@hotmail.com; the account was wished a happy birthday on September 6, 2021,

7

which is a day after **BLALOCK's** birthday; the account sends the name, "Karon Blalock" in a message; and it sends (202) 817-7596 in messages.

23. A subpoena of (202) 817-7596 showed it is a T-Mobile number subscribed to **Karon BLALOCK** with the address 602 Morton St. NW, Apt. 12, Washington, DC 20010. The account was activated on May 23, 2020.

24. Based on the conversations your affiant believes that (202) 817-7596 is associated with **BLALOCK**, who was a downstream recipient of blue "M-30" fentanyl pills from VALDEZ.

25. On October 27, 2023, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia authorized a search warrant (23-sc-2311) authorizing the monitoring of the global positioning system and cell site location of (202) 817-7596. As noted above, on November 6, 2023, **BLALOCK**, along with other co-conspirators, was charged in the fourth superseding indictment in case 23-cr-73-CKK with conspiracy to distribute and possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl from August 2020 to November 2023. An arrest warrant for **BLALOCK** was subsequently authorized.

### *Arrest of BLALOCK*

26. On November 9, 2023, APD officers utilized the cell-site location information, authorized by search warrant 23-sc-2311, for (202) 817-7596, to effectuate **BLALOCK's** arrest. From the use of this location information, APD was able to locate **BLALOCK** in the vicinity of the Blake Apartment Complex, located at 2000 N Beauregard Street, Alexandria, Virginia. **BLALOCK** was discovered inside his vehicle, a Honda Accord bearing Maryland tag number 1FC8714, where he was the sole occupant inside the vehicle. **BLALOCK** was subsequently placed under arrest without incident.

27. After **BLALOCK's** arrest, APD officers performed an inventory search of his vehicle prior to its impoundment. During this inventory search, the **TARGET DEVICES** were discovered on top of the center armrest and inside the center console of the front portion of the vehicle. As described *infra*, your affiant did not learn of the seizure of the **TARGET DEVICES** until on or about October 10, 2024.

28. Your affiant believes, based on text message conversations between VALEZ and **BLALOCK** that **BLALOCK** obtained drugs from VALDEZ and resold those drugs to individuals in the DC area. As a result, your affiant has probable cause to believe that the **TARGET DEVICES** will contain evidence of the **TARGET OFFENSES**.

29. Due to the above facts, I submit that there is probable cause to believe that evidence relating to violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 21 U.S.C. § 846 (Conspiracy Thereof) may be found within the **TARGET DEVICE**.

## CURRENT LOCATION OF THE TARGET DEVICE

30. The **TARGET DEVICES** are currently in the custody of the Alexandria Police Department located at 3600 Wheeler Avenue, Alexandria, Virginia. As described above, the devices were seized from the person of **BLALOCK** incident to his arrest in connection with his indictment following their arrests on probable cause. Therefore, while the DEA might already have all necessary authority to accept custody of the **TARGET DEVICES** from APD and subsequently examine the **TARGET DEVICES**, I seek this warrant out of an abundance of caution to be certain that an examination of the **TARGET DEVICES** will comply with the Fourth Amendment and other applicable laws.

31. The **TARGET DEVICES** currently are in the APD evidence vault at 3600 Wheeler Avenue, Alexandria, Virginia. In my training, experience, and interaction with the APD seizing officers, I know that the **TARGET DEVICES** have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state, as they were when the **TARGET DEVICES** first came into the possession of APD.

32. In acknowledging that the phones have been in law enforcement's possession since November 9, 2023, I am aware of the Fourth Circuit's decision in *United States v. Pratt*, 915 F.3d 266 (4th Cir. 2019), which found that a 31-day delay between the seizure of a cell phone and the obtainment of a search warrant for its contents was constitutionally unreasonable. I also know that the *Pratt* Court opined that in determining whether an extended seizure violates the Fourth Amendment, courts are to balance "the government's interest in the seizure against the individual's possessory interest in the object seized," which includes factoring in "whether the police diligently pursue[d] their investigation" and "the suspect's unique circumstances." *Id.* at 271–72. That is, a suspect who is incarcerated has a "significantly diminished possessory interest" in the seized item than a "suspect who has resisted a search and seizure and remains free from police custody." *United States v. Dorsey*, 2019 WL 3804113 (D. Md. Aug. 13, 2019) (citing *Pratt*, 915 F.3d at 271-72, and *United States v. Sullivan*, 797 F.3d 623, 633-34 (9th Cir. 2015)).

33. While acknowledging the decision in *Pratt*, law enforcement believes that the circumstances in this situation are distinguishable from *Pratt* for the following reasons:

   a. First, when APD seized the **TARGET DEVICES**, probable cause existed at the time of the seizure to believe that evidence was located within the cellular phones;

   b. Second, on November 13, 2023, when custody of **BLALOCK** was transferred from Alexandria Detention Center to federal authorities, including your affiant, the only

        personal property belonging to **BLALOCK** identified by detention officers to your affiant was United States currency, which was also transferred to your affiant. Your affiant did not learn of the existence of the **TARGET DEVICES** until on or about October 10, 2024. It was therefore not practicable for law enforcement to apply for the requested warrants until that date; and

    c.    Third, **BLALOCK** has been in continuous custody since his arrest on November 9, 2023. To the best of my knowledge, and after conferring with APD officers who seized the **TARGET DEVICES**, it appears that neither **BLALOCK**, nor his legal counsel, have ever requested the **TARGET DEVICES** be returned.

## USE OF CELLULAR PHONES BY DRUG TRAFFICKERS

34.    Based on my training and experience, I am aware that an illicit narcotics transaction requires a distributor, controlled substances, a client, communication, a transaction location and an exchange of something of value, which is usually United States currency. In the modern era of narcotics trafficking, technological advances have mostly replaced "open air drug markets". The use of cellular communication devices has become an essential tool in the exchange of controlled substances between sources of supply, distributors and users. Fundamentally, cellular communication devices usage transcends the various levels of narcotics trafficking and are often in use from the production to the end user phases. I know that cellular communication devices are utilized to structure the illegal transactions by allowing a source of supply and a customer to arrange meeting locations, confirm the quantity desired and expected price for agreed upon quantities. The structuring of these illegal transactions can be performed via traditional voice calls, text messaging, application-based peer-to-peer communication and even electronic mail services.

More often than not, the cellular communication devices utilizing these peer-to-peer communication techniques often store these records until they are physically deleted by the user.

35. From experience and training, I have learned that narcotics traffickers rarely refer to narcotics by name. Instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to narcotics by using seemingly innocent terms or coded language. Narcotics traffickers also use the electronic communications capability of their cellular telephones to conduct, facilitate, and further conceal their illegal activities. I also know that drug traffickers frequently have access to several cellular telephones and that they periodically use newly acquired cellular telephones, all in an effort to avoid detection and to thwart law enforcement.

36. Based on my training and experience, I am aware that drug traffickers commonly make and maintain business records. Specifically, it is quite common for those involved in the manufacture, sale, purchase, and transportation of controlled substances to generate and maintain writings, books, records, receipts, notes, ledgers, lists, airline tickets, money orders, package and shipping labels, and other memoranda to assist in their criminal activities. These materials are created and maintained in much the same way and for the same reasons as persons involved in legitimate businesses. Drug traffickers maintain records in order to know the current status of the various illegal transactions in which they are involved. Without the aid of such records, drug traffickers would face a high possibility of error and mistake due to the number, complexity, and frequency of their transactions, and the clandestine nature of drug trafficking activities.

37. Based on my training and experience, I am also aware that drug traffickers commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers of their associates in drug trafficking. They also store such

information, as well as photographs, messages, and personal notes, in electronic equipment including, but not limited to, computers, cellular phones and other electronic software and mediums. Drug traffickers often take or cause to be taken photographs and/or videotape of themselves, their associates, their property, and evidence of their drug trafficking. These materials are usually maintained in their possessions, to include cellular devices, and/or residences.

38. I am further aware from my training and experience that drug traffickers commonly use cellular phones, as well as other communication devices, to keep in constant contact with their suppliers, associates, and clients in drug trafficking. Drug traffickers have also been known to use electronic data processing units, including all internal and external storage devices and related hardware and software, to hold files that contain names, addresses, and/or telephone numbers of their associates in drug trafficking. They also use such devices to maintain and electronically record receipts, notes, ledgers, owe sheets, financial information, money orders, and other records relating to the transportation, ordering, sale, and distribution of controlled substances.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

39. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

40. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET DEVICES** were used, the purpose of its use, who used it, and when. There is probable

cause to believe that this forensic electronic evidence might be on the **TARGET DEVICES** because:

    d. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    e. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    f. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    g. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    h. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **TARGET DEVICES** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **TARGET DEVICES** to human inspection in order to determine whether it is evidence described by the warrant.

42. *Manner of execution.* This warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Therefore, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

43. I submit that this Affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET DEVICES** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*Kenneth Louvar*
Kenneth Louvar
Special Agent
Drug Enforcement Administration

Subscribed and sworn to by telephone in
accordance with Fed. R. Crim. P. 4.1 on
this 18th day of October 2024.

_____
The Honorable Lindsey R. Vaala
United States Magistrate Judge

## ATTACHMENT A

(Property to be Searched)

The property to be searched, collectively the "**TARGET DEVICES**," are:

1. a purple C5L Max Android cellular device, bearing Alexandria Police Department Evidence Number EVD-23-242713, hereinafter **TARGET DEVICE 1**;

2. a blue Apple iPhone, with a black case containing the inscription "Money Maul," bearing Alexandria Police Department Evidence Number EVD-23-242714, hereinafter **TARGET DEVICE 2**; and

3. a blue Apple iPhone, with a black Otterbox case, bearing Alexandria Police Department Evidence Number EVD-23-242715, hereinafter **TARGET DEVICE 3**.

The **TARGET DEVICES** are currently located at the Alexandria Police Department, 3600 Wheeler Avenue, Alexandria, Virginia, which is located in the Eastern District of Virginia.

**Photos of Target Device 1**

 

**Photos of Target Device 2**



**Photos of Target Device 3**



This warrant authorizes the forensic examination of the **Target Devices** for the purpose of identifying the electronically stored information described in Attachment B.

2

## ATTACHMENT B

1. All records on the **TARGET DEVICES** described in Attachment A that constitute fruits, evidence, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 21 U.S.C. § 846 (Conspiracy Thereof) involving **Karon BLALOCK** and others including information pertaining to the following matters:

   a. documents, communications, or other information relating to the purchase, sale, transmission, or use of controlled substances;

   b. documents, communications, or other information relating to the transfer or attempted transfer of money by wire, between bank accounts, and/or by or between credit card processing accounts, including the nature, source, destination, and use of those funds;

   c. documents, communications, or other information relating to the structuring or other concealment of financial transfers and/or withdrawals;

   d. lists or ledgers of related to illicit drug transactions such as money collected, owed, or spent;

   e. lists, ledgers, or other information memorializing items purchased relating to the distribution of drugs such as glassine envelopes, smoking devices, packaging materials, etc. (including the types of items, amounts paid, and payment information used), as well as the dates and places of transactions;

   f. identity documentation, such as visas, passports, driver's licenses, birth certificates, and immigration records;

   g. bank records, checks, credit card bills, account information, and other financial records;

   h. documents, communications, and other information regarding **BLALOCK** or potential co-conspirators' schedule or travel;

   i. communications with co-conspirators regarding the criminal conduct identified above or that would reveal the identity or relationships between co-conspirators;

   j. photographs of **BLALOCK**, his suppliers, his customers, or other currently unknown co-conspirators involved in the criminal conduct identified above or that would reveal the identity or relationships between co-conspirators;

    k. documents, communications, and other information regarding the usernames, phone numbers, e-mails, or social media or instant messenger names used by **BLALOCK**, his suppliers, his customers, or other currently unknown co-conspirators to communicated regarding drug trafficking;

    l. documents, communications, and other information indicating the state of mind as it relates to the crimes under investigation of **BLALOCK**, his suppliers, his customers, or other currently unknown co-conspirators; and

    m. evidence of user attribution showing who used or owned the **TARGET DEVICE** at the time the activities described in this warrant were created, edit, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes the review of electronic storage media and electronically stored information seized or copied pursuant to this warrant to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, including law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

If the government identifies seized materials, that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review until a Filter Team of government attorneys and agents is established. The Filter Team will have no future involvement in the investigation of this matter. The Filter Team

2

will review seized communications and segregate potentially protected materials, i.e., communications that are to/from an attorney, or that otherwise reference or reflect attorney advice. At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team and the Prosecution Team may resume its review. If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel/counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team. The investigative team may continue to review any information not segregated as potentially privileged.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the Drug Enforcement Administration (DEA) may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.